## Case No. 14,934.

### UNITED STATES v. DAY.

[6 Am. Law Reg. 632.]

Circuit Court, D. New Jersey. 1858.

CONTEMPT — VIOLATION OF INJUNCTION — SUBSEQUENT DECREE.

1. A contempt of court in the United States courts must arise from disobedience of or resistance to some decree or order in existence. Hence where A., on the 17th day of September, 1852, sold a certain patent while a suit was pending in relation to it, and on the 28th of September, 1852, an injunction was issued, held, that the sale was no contempt.

2. The history of the law of contempt in the United States courts traced and discussed.

Report, per GREEN, Master:

This honorable court, by its order dated 23d day of March, 1853, directed the subscriber, one of the masters of the court, to continue the examination of the defendant in this proceeding on interrogatories to be propounded and answered in such form as he should direct, and he hereby reports, that the said defendant attended before him,

from time to time, and answered in writing, under oath, the several interrogatories to him propounded, which said interrogatories and answers are returned to this court with this report.

The subscriber would also report, that in pursuance of the order of the court, he examined William H. Rogers, Amos D. Wyckoff and John Helm, witnesses produced before him at the instance of the relator, in reference to the contempt charged in this proceeding, and he hereby returns to this court, with his report, the examination of the said witnesses.

And it is further ordered, that the said master report to the court in writing, whether or not the said defendant is in contempt for having violated an injunction tested on the 28th of September, 1852, and which, directed to Horace H. Day, and his agents, etc., commands them from thenceforth to desist and refrain from making, using, or vending to others to be used, any manufactures, goods, articles or materials, composed of India-rubber, prepared in the manner specified in the patent granted to Nathaniel Hayward, as assigned to Charles Goodyear, or in the manner specified in the patent reissued to the said Charles Goodyear, and from infringing upon and violating the said patent in any way whatsoever. [Case No. 5,569.] The injunction is not to prevent the defendant from manufacturing shirred or corrugated goods, and such other articles as the said defendant is authorized to make under certain articles of agreement made and entered into between him and the complainant.

It appears from the evidence that the writ of injunction was served on Day and Rogers and Wyckoff on the same day it was issued or the day after, and that orders were sent to the factory at New Brunswick, on that day, directed to Mr. Rollo, who was in charge of the establishment, to desist from further manufacturing any articles which would or could be considered a violation of the injunction, and Day, Rogers, Wyckoff and Helm, the witnesses examined before the master, all unite in saying that they believe that the instructions were observed and carried out. But it is insisted on the part of the relator, that Day's conduct before and after the 28th of September, amounts to a violation of the injunction, and that he ought to be adjudged to be in contempt, and most of the evidence taken has had reference to this point.

It appears from the examinations taken before me, that on the 17th of September, 1852, Horace H. Day executed to Rogers & Wyckoff an absolute bill of sale, in consideration of $225,000, for all the stock of goods, fixtures and materials, at 23 Courtland street, New York, and the machinery, and every thing else, except water wheels, in the factories at New Brunswick, at Piscataway, and at Great Barrington; all India-rubber goods on consignment, and a full li-

cense to use in their own business, all the patents or patent rights belonging to Day, and took in payment the promissory notes of Rogers and Wyckoff jointly, twenty-eight in number, from sixty days to thirty-four months, secured by mortgages on the property included in the bill of sale, except the property at Courtland street store; that the sum of fifty dollars was paid by Rogers & Wyckoff to bind the bargain; that Day also executed leases for the factories, &c., at New Brunswick, Piscataway, and Great Barrington, and 23 Courtland street, with conditions that he, Day, should have an office, in which to conduct any other than an India-rubber business, and the privilege of keeping a sign at the door, and over the entrance to his office. A rent is reserved in each of the leases, and the term fixed is seven months and thirteen days.

Rogers & Wyckoff were the clerks of Day, and had property to no very large amount; no inventory was made or appraisement had. Rogers & Wyckoff took possession and opened a new set of books, and bought and sold, and made the usual entries in the books of the firm of Rogers & Wyckoff, and matters continued in this way till the 19th of October, little more than a month, when the parties under their hands and seals, rescinded the bill of sale, leases, mortgages and licenses, and agreed to cancel the notes and mortgages, and Rogers & Wyckoff were to account to Day for the amount sold by them of the purchased goods, and Day agreed to allow Rogers & Wyckoff for all cash paid by them on the purchase of goods then mixed up with the others in the store, and to assume and pay their credit obligations for the same.

It is insisted by the counsel for the relator, that. this sale, including some vulcanized rubber, made while the suit was pending, and with a full knowledge of the matter in dispute, is a violation of the injunction. Several cases are cited from the English chancery books in support of their position, and it may be well briefly to examine these cases to ascertain how the law of contempt has been settled in England. The first case cited is from 14 Ves. 136, Osborne v. Tenant. In this case, Lord Eldon, the chancellor, ruled, that as the party, by his attendance in court, was apprised of what the decision of the court would be, and that an injunction would be ordered, and left the court at the moment the decision was pronounced, and did an act to defeat such decision, the court would hold the party to the same consequences, as if the order had been actually made. So, also, in the case of Skip v. Harwood, from 3 Atk. 564, Lord Hardwicke committed the defendant to the Fleet, for contempt, on the ground that he attended in court the whole time that the argument was going on; was present when the opinion was delivered, and left the court just as the decree for an injunction was given, and removed in a fraudulent and collusive manner a part of the partnership effects, which, by the decree, he was restrained from doing. But these cases are distinguishable from this case in several particulars. This case was argued in March, 1852, and no decision was made till the 28th of September, some six months afterwards. The merits had been discussed by able counsel on both sides, upon a very large amount of evidence, not without some doubt as to its weight. No intimation had fallen from the court as to their opinion, and the case was held under advisement till the 28th of September, 1852. Lord Eldon, in a subsequent case of James v. Downes, 18 Ves. 521, revives this subject, and holds this language: "a party cannot be committed for the breach of an injunction, that express species of contempt, unless there is an injunction. There is no instance, previous to the case of Osborne v. Tenant, that the court ventured to consider the act of contempt, unless the party being present in court, heard the order for an injunction made." That if the party was in court while the motion for an injunction was proceeding, he should not escape the process by turning his back before the court pronounced the order "Let the injunction go," for this would be considered a mere contrivance. The judges appear to have laid down no general principle in these cases; each case seems to regulate itself, and depends much upon the temper and peculiar mind of the judge.

To place the suitor within the entire control of the court, is not in harmony with the free institutions of our country, and when the matter was first debated before the master, he felt confident that some legislative enactment would be found, which would define the power of the court, defend its dignity, preserve its order, enforce its decrees, and at the same time protect the liberty of the citizen. What is the legislation on this subject?

In the act of congress to establish the judicial courts of the United States, approved September 24, 1789 [1 Stat. 73], it is provided in the seventeenth section, that all the courts in the United States should have the power to punish by fine and imprisonment, at the discretion of the court, all contempts of authority in any cause or hearing before them, and then by the ninetieth rule regulating the practice of the courts of equity of the United States, the practice of the circuit court, unless provided for by rule, should be regulated by the practice of the high court of chancery in England, so far as the same could be reasonably applied. The courts have therefore taken the English cases as their guide, and continued to do so until the year 1831, when congress passed an act entitled an act declaratory of the law concerning contempts of court. See 4 Stat. 487. By this law it is enacted, that the power of the courts of the United States to issue

attachments and inflict summary punishment for contempt of court, shall not be construed to extend to any cases except the misbehavior of any person in the presence of the court, or so near as to obstruct the administration of justice, the misbehavior of any officer in his official transactions, and the disobedience or resistance by officer, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of the court.

As this is an important act, and seems to settle the case before the court, some pains have been taken to ascertain its origin. We find that Hon. James H. Peck, judge of the district court of the United States for the district of Missouri, was impeached by the house of representatives, under the following circumstances: He had delivered an opinion, and given judgment in accordance therewith, in an action pending in his court, in favor of the United States affecting the title to a large tract of land. The losing party appealed from the decision, and before the determination of the case, Judge Peck published in one of the public newspapers, his opinion. The counsel for the applicant published an article, in another newspaper, purporting to expose the errors of doctrine and fact alleged to exist in the opinion of the judge. There is nothing offensive in the language or manner of the article. A few days after the appearance of the article, the judge directed proceedings to be instituted, as for a contempt; in a summary manner, an attachment was issued against the attorney, and he was brought before the judge, but declined submitting to interrogatories, as he wished to recall nothing that he had written. He was, by the order of the judge, committed to prison for twenty-four hours, and suspended from practicing as an attorney in that court for eighteen months. This order was in the spirit and letter of the English cases, and considered as a legitimate exercise of the power vested in the court. But the attorney protested, and the case ultimately reached Washington, and Judge Peck was impeached by the house, and tried before the senate, and escaped conviction by a single vote. The subject of contempt was discussed before the court of impeachment, by the first legal minds of the country—by Wirt and Meredith, by Buchanan and Story, and Spencer and Wickliffe. A few days after this decision, a member of the house of representatives offered a resolution that the committee on the judiciary should be directed to inquire into the expediency of defining by statute all offences which may be punishable as contempt of the courts of the United States, and also to limit the punishment of the same; and Mr. Buchanan, the chairman of that committee, reported the act of the 2d of March, 1831. The action of Judge Peck was considered, by those who voted for his conviction, as a great disparagement of public justice, as an abuse of judicial authority, and as a subversion of the liberties of the people of the United States.

The law passed was beyond doubt intended as a guide for the courts, and to forbid in future all constructive contempts; and that the courts should make use of the writ of attachment for the protection of themselves, and not for the benefit of the party complaining. By this act, to constitute a contempt, there must be a decree or order in existence, and a disobedience or resistance to such decree or order. Applying this reasoning to the sale of the 17th of September, 1852. How can this sale be said to be a disobedience of a decree not entered up till the 28th of September, some ten days afterwards. Besides, Day, and Rogers, and Wyckoff all unite in swearing that they had no intention to defeat the decree of the court, for they one and all say they thought Day would be the successful party. We find in the case of U. S. v. Dodge [Case No. 14,975], the law on this point thus expressed: "If the party against whom an attachment has issued for a contempt, by his affidavit and answers to interrogatories discharge himself of the contempt, no further proceedings can be had against him in the attachment; but if perjury appear, he will be recognized to answer," &c.

But is there anything in this extraordinary sale, and in what took place between its execution and rescission, which can be considered a disobedience to the injunction? There can be no doubt, that a part of the goods sold by Day to Rogers and Wyckoff, consisted of vulcanized rubber, manufactured prior to the 17th of September, and an infringement of Goodyear's patent; and, also, that a part of these goods were sold by Rogers and Wyckoff, before the decision. Did the testimony fix with certainty, that the vending of the vulcanized rubber goods after the service of the injunction was made, under the direction of Mr. Day, I should be inclined to report him in contempt, for I hold the law to be, that as soon as the decree was entered, confirming the right of Mr. Goodyear, all goods manufactured in infringement of that right, were contraband, and any sale or intermeddling with them, would be a using in disobedience of the injunction. But the testimony does not show that after the 28th of September, 1852, Mr. Day manufactured or sold any prohibited article, and his liability, if any, must rest upon his consent and knowledge of what Rogers & Wyckoff did. The law upon this point appears to be, that one may be guilty of a breach of an injunction, by aiding and abetting those who are committing an act inconsistent with it, although he should not actually take part in such act.

Did Rogers & Wyckoff, after the 28th of September, 1852, do any act inconsistent with the injunction? If they did, it must have been by vending the prohibited articles. Now, in the language of one of the cases cited, Magennis v. Parkhurst, 3 Green, Ch. [4 N. J. Eq.] 434, "the party alleging a contempt of

court by breach of an injunction, must make it out clearly to the satisfaction of the court." The defendant has denied the contempt under oath. Does the testimony of Rogers & Wyckoff, and Helm prove it? Helm in his answer, says, that after the 28th of September he mixed rubber compound for heating, for the purpose of making shirred cloth, and nothing else, and there were shoes made up out of the compound, which was prepared, or partially prepared before the decision; nothing but shoes. William H. Rogers estimated the sales at 23 Courtland street, between the 17th of September and the 19th of October, at from $15,000 to $20,000, and to the question, of that sum, about how much was vulcanized India-rubber goods? he answers that if the webbing or shirred cloth be considered vulcanized, then two-thirds of the sales were vulcanized, and he does not recollect that during that period, Day made himself responsible for any debt contracted by Rogers & Wyckoff. He further says that Rogers & Wyckoff continued after the decision, to sell vulcanized rubber goods, including over-shoes, but that Day did not induce him or Wyckoff to sell vulcanized rubber goods to any person; the persons having goods on consignment made returns of their sales to Rogers & Wyckoff, but Mr. Day did not receive any moneys from them; that there was not ever at any time any understanding that Day should have any interest in the business or property after the sale of the 17th of September, or that Rogers & Wyckoff should act as agents for Day, or that the business should be conducted for Day's benefit. Amos D. Wyckoff, who was the principal bookkeeper, and was constantly at the store, 23 Courtland street, says that Rogers & Wyckoff did sell vulcanized rubber goods, which had been manufactured by Day before the 17th of September, and included in the sale, but the quantity he cannot tell, and that what remained were retransferred to Day, and remain in the store, No. 23 Courtland street. The testimony of this witness does not show any participation of Day in the sales, or that he aided therein.

It was insisted by the counsel of relator, that the sale of the 17th of September was fraudulent and void, but however unusual the terms of payment may be, and however insufficient the security, still it is not perceived that these are unmistakable marks of fraud. The sale was good between the parties, and passed the title from Day to Rogers and Wyckoff, and however void as against Goodyear, if it had not been rescinded, it is valid between the parties. It cannot be concealed that the sale of the 17th of September, and its rescission, are marked with some extraordinary features, but they do not, in my opinion, make the acts of Rogers & Wyckoff those of Day, and bring him within the severe consequences of having disobeyed the injunction, and thus subject him to fine and imprisonment. Besides any damage which Goodyear may have sustained, can be ascertained and liquidated by the master, who is yet to take an account of all the rubber goods manufactured and sold by the defendant, in violation of the patent of the complainant. Much time has been spent in the investigation of this subject, but the master does not think that it has been misspent, for it was right that this whole transaction should be disclosed. Though the examination in the case was continued for several days, it was not a case of oppression on the part of the complainant.

All these suggestions are respectfully submitted to the court, and the master reports on this branch of the case that, in his opinion, under the true construction of the act of congress, of March, 1831, and the testimony taken, the defendant, Horace H. Day, is not in contempt.

THE COURT subsequently confirmed the master's report. [Unreported.]

